# Quijada v. Unifrutti of America Inc.

*Michael J. Stack,* for plaintiff.
*Alan Greenberg,* for defendant.

AVELLINO, *J.,* May 17, 1991—This (miscellaneous) litigation is before me for a *second* time pursuant to a statutory grant of court access.[1] Initially, it raised (at least) two intriguing questions: (1) Was a Chilean arbitrator the functional equivalent of a foreign "tribunal;" and (2) Was a Chilean farmer's demand for arbitration based upon his suspicion ("hunch" or "reasonable belief") that he

---

1. See 42 Pa.C.S. §5326, assistance to tribunals and litigants outside this Commonwealth with respect to depositions:
    "(a) *General rule*—A court of record of this Commonwealth *may* order a person who is domiciled or is found within this Commonwealth to give his testimony or statement or to produce documents or other things for use in *a matter pending* in a *tribunal* outside this Commonwealth. The order *may* be made upon the application of any interested person or in response to a Letter Rogatory and *may* prescribe the practice and procedure, which *may* be wholly or in part the practice and procedure of the *tribunal* outside 'this Commonwealth, for taking the testimony or statement or producing the documents or other things." (emphasis added) See also, 1 Pa.C.S. §1991 (explaining that the word "may" is permissive whereas the word "shall" is mandatory).

was shortchanged by a Chilean exporter the functional equivalent of a "matter pending" in a Chilean tribunal?

Briefly, in 1986 and 1987, Waldo Tornel Quijada, a Chilean *farmer,* contracted to sell all of his grapes to Unifrutti Traders Limitada, a Chilean *exporter.* More importantly, perhaps, the farmer and the exporter agreed to submit disputes arising from their contract to Jorge Carey Tagle, a Chilean arbitrator.[2]

After acquiring the farmer's grapes, the exporter sent some of them on a free consignment basis to selling agents, including the respondent, Unifrutti of America. Unifrutti is an American jural "person" that has its principal place of business in Philadelphia, and hence is subject to the personal jurisdiction of this court. Unifrutti is *not,* however, subject to the personal jurisdiction of a Chilean court.

The first time I saw the farmer, he told me that he suspected or (believed) that the (actual) sale prices for his grapes were probably *higher* than the amounts that the exporter told him that it received from its selling agents, including Unifrutti. Hence, before coming to this court (as opposed to the nearby federal court),[3] the farmer triggered an arbi-

---

2. Everyone connected with this litigation now agrees that arbitration proceedings are authorized and, perhaps, "encouraged" by Chilean law. Meanwhile, by agreeing to arbitrate their disputes, the farmer and the exporter surrendered their right under Chilean law to a judicial review of the arbitrator's judgment.

3. The federal courts were "open" to the farmer. See, e.g., 28 U.S.C. §1782 (1966) (granting court access to foreign litigants or tribunals seeking "assistance" with pending cases on terms that more or less replicate those in the assistance statute, *supra,* note 1). On the underlying justification for the federal statute, namely, Article III of the U.S. Constitution, see, e.g., *Bank of the United States v. Devereaux,* 5 U.S. (1 Cranch) 61, 87 (1809). ("However, true the fact may be, that [state courts] will administer justice *as impartially* as those of

tration proceeding in Chile. As near as I can tell, the arbitration was designed to compel the exporter to make what resembles a Pennsylvania "accounting." For example, in order to animate a Chilean court to empower Mr. Tagle, the farmer explained:

"I propose to file suit before [the arbitrator] against [the exporter], in order that [the arbitrator], on the basis of the evidence submitted and in observance of the applicable sound equity and legal provisions, determine the real and actual resulting total price of the sales made as a consequence of the two contracts whose copies have been filed in the record; and order the [exporter] to pay me the final price determined by [the arbitrator]; . . . and/or compensate me for damages arising from failure to pay the really agreed price."[4]

Relying largely upon the facts I've just recited, the farmer contended that under Pennsylvania law, he had the "right" to use this court (and its process) to "discover" certain documents in the possession

---

the nation, to parties of every description, it is not less true that the Constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehension of suitors, that it has established *national* tribunals for the decisions of controversies *between aliens and a citizen. . . .*") (emphasis added) Cf. Frankfurter, *Distribution of Judicial Power Between United States and State Courts,* 4 Cornell L. Rev. 499 (1928) (contending that state courts are just as "good," and arguably "better," than federal courts at handling "diversity" cases that do not involve "federal questions"). But see, Greenberg, *The Appropriate Source of Law for Forum Non Conveniens Decisions in International Cases: A Proposal for the Development of Federal Common Law,* 4 Intl. Tax & Bus. L. 155 (1986) (contending that the decision to grant or deny court access to a trans-national plaintiff, at least arguably, is a "federal question").

4. See petitioner's (translated) writ for "prejudicial measures," filed on September 14, 1989, in Santiago, Chile.

of Unifrutti here in Philadelphia.[5] He added that he needed these documents in order to pursue his "accounting" in Chile.

Although the farmer's initial petition (and so on) left me wondering,[6] chances are good that a Chilean arbitrator is the functional equivalent of a "foreign tribunal."[7] This (legal) technicality aside, it has always been perfectly clear—at least to me—that the farmer did not have the "hard evidence" that he probably needed in order to decide whether or not he was *justified* in believing that he had been short-changed by his exporter.

The farmer's "hard-evidence" problem was hardly unique. Speaking broadly, American civil procedure addresses this problem (among others)

---

5. For the text of the assistance statute that (ostensibly) authorized the farmer's contention, see *supra* note 1.

6. Chilean justice is sometimes ridiculed by American courts on the grounds that the decisions made by Chilean judges are "reversible" by a military junta. For an illustration of lampooning that was hopelessly gratuitous, see, e.g., *Holmes v. Syntex Laboratories Inc.,* 202 Cal. Rep. 773, 775 & n.1 (Cal.App. 1 Dist. 1984) (quoting and "clarifying" ill-advised (on-the-record) comments about Chilean justice that were made by a trial judge in a woeful attempt to explain that British tribunals were a "suitable" alternative forum for British plaintiffs who preferred instead to sue a California defendant in its "home" forum).

7. Both sides (subsequently) supplied expert affidavits explaining that Chilean arbitrators are expected to "judge" (or adjudicate) disputes in a more or less "fair" manner, and hence, "are equivalent to [Chilean] courts." See, e.g., Report of E.A. Allessandri. See also, Uniform Interstate and International Procedure Act (13 U.L.A.) §302, comment (explaining that the term "tribunal" was intended by the proponents of the Uniform Act to encompass any body performing a judicial function). The assistance statute *supra* note 1, replicates the Uniform Act.

with pretrial discovery. For example, Pennsylvania civil procedure, at least since 1979, has authorized litigants in *pending* actions to use a broad (or, perhaps, "fishing expedition") style of discovery to search for the "hard evidence" they sometimes need in order to determine whether or not there is any basis for their reasonable belief in the validity of a claim (or defense).[8] Moreover, federal civil procedure, at least on the surface, continues to take the stance that discovery is a "right" that should be available to a litigant who needs "hard evidence" in order to decide whether or not her reasonable belief in the validity of a claim (or defense) is justified.[9] I should add, perhaps, that the rule-makers in 26 states have replicated the Federal Rules of Civil Procedure, and that the discovery rules in the remaining states are frequently patterned after the federal rules.[10]

---

8. See, e.g., *Frisby v. Zinner,* 49 D.&C. 3d 115 (1987) (quoting Judge Wettick's comments respecting the interplay between Pa.R.C.P. 1024, which authorizes parties to file pleadings based upon their "reasonable belief" that their claims (or defenses) are valid, and the discovery authorized by Rules 4001-25).

9. See, e.g., Friedenthal, *A Divided Supreme Court Adopts Discovery Amendments to the Federal Rules of Civil Procedure,* 69 Calif. L. Rev. 806, 815-19 (1981) ("The very purpose of permitting pleadings based upon good-faith speculation must be to permit plaintiffs to employ the discovery provisions to determine whether a valid case in fact exists." *Id.* at 816).

10. On "replication," see, e.g., Subrin, *Federal Rules, Local Rules, and State Rules: Uniformity, Divergence, and Emerging Procedural Patterns,* 137 U.Pa.L. Rev. 1999, 2026-31 (1989) (also explaining why "replication" is no longer popular with state rule-makers).

Yet, pretrial discovery is hardly a necessary adjunct to a civilized jurisprudence.[11] Indeed, discovery as we know it is either unavailable or unheard of outside of the United States.[12] For example, American-style discovery is not available in South

---

11. Discovery was *never* authorized on the *law* side of Pennsylvania courts until 1951 when the first discovery rules became effective. However, it is perfectly clear that an "illegal" discovery practice flourished in Philadelphia long before mid-century, despite the Supreme Court's numerous attempts to stop it. See, e.g., *Intl. Coal Mining Co. (No.1) v. Pennsylvania R.R.,* 214 Pa. 469, 473-74, 63 A. 880 (1906) (reversing an illegal "discovery" order, and reporting that the president judge of the Philadelphia Common Pleas Court had finally agreed to stop a 70-year-old practice whereby lawyers routinely deposed non-party witnesses). See also, *Quinn v. Pennsylvania R.R.,* 219 Pa. 24, 26, 67 A. 949 (1907) (explaining that it was "error" to enter an order allowing the *pretrial* inspection of documents); accord *Whetsel v. Shaw,* 343 Pa. 182, 22 A. 751 (1941).

Speaking broadly, the 1951 "discovery" rules did not authorize any pretrial disclosure worth mentioning. Instead, those rules more or less codified the Bill of Discovery case precedents on the equity side of the court. According to the chairman of the Rules Committee, the larger goal of the Supreme Court was to "transfer" the existing equity practice to the law side of trial courts and, hence, allow lawyers (or their clients) to obtain "justice" in one litigation as opposed to two. Kenworthy, *Discovery under the Proposed New Rules,* 20 Pa.B.A.Q. 17, 17-19 (1948) (also collecting and briefly describing the leading equity case precedents that were eventually codified in the 1951 rules which can be found at 369 Pa. xxx (1952)).

12. For a brief discussion of the foreign stance towards American-style discovery, see, e.g., W. Schwarzer & L. Pasahow, *Civil Discovery: A Guide to Efficient Practice,* 77-80 (1988) ("[S]ome foreign countries—including Egypt, France, West Germany, Italy, Luxembourg, Norway, Switzerland, and Turkey, [take the stance] that *even voluntarily* supplied discovery violates their law." *Id.* at 80. (emphasis added)). For a more elaborate discussion, see, e.g., Teitelbaum, *Strict*

America.[13] Instead, South American claimants (or "plaintiffs") typically need to have a "case" before they arrive in their tribunals since they are not likely to find one afterwards.[14]

*Enforcement of Extraterritorial Discovery,* 38 Stan. L. Rev. 841 (1986) (explaining that many nations *bar,* typically by criminal statute, their citizens from producing documents that are needed by litigants using American courts to obtain justice).

13. *See, e.g.,* Weinberg, *The Helicopter Case and The Jurisprudence of Jurisdiction,* 58 S. Cal. L. Rev. 913, 932-34 (1985) (explaining, perhaps too dramatically, that American widows and orphans who are required to litigate tort claims in South American tribunals are not likely to find any of the "unmatchable features" of American-style justice, like contingency fees, pretrial discovery, strict liability, punitive damages, or so on).

14. *Id.* Judging from the Letters Rogatory, *infra* note 24, and so on, Chilean judges are not empowered to order American-style *pretrial* discovery in civil cases. But see R. Cappalli, *Expert Report* (dated 11/27/90) at 9 ("It is incorrect to state that civil law countries like Chile do not [supply] any discovery rights").

This aside, Chilean judges are plainly authorized to order a non-party witness to attend an adjudicatory hearing (or "trial") and to produce the documentary evidence within his (or her) control, *if* the judge is satisfied *beforehand* that the witness, the documents, or both, are likely to be required for purposes of adjudication. Accord R. Cappalli, *id.* at 11-12. Speaking broadly, the power to compel the presence of witnesses (and so on) at an adjudicatory hearing is a common feature of nearly all of the foreign models for administrating justice, and is probably mandated in the American model by the U.S. Constitution. The ex ante approval feature is the only difference worth mentioning between the foreign and American models on this subject. In American courts, lawyers are usually authorized to issue subpoenas subject to an ex post review for their mistakes. For a brief discussion of the statutory (and inherent power of Pennsylvania courts to compel the presence of witnesses and documents for trial purposes, see, e.g., S. Feldman, *Pennsylvania Trial Guide 2d* §§3.1-3.5 (1987).

Hence, when I first saw the farmer, I was confronted with an important threshold question: Whether or not a Chilean tribunal was likely to authorize (pretrial) discovery from a non-party witness, assuming, of course, that the witness was amenable to the in personam jurisdiction of a Chilean tribunal. Unfortunately for the farmer, his lawyer had no information worth mentioning that might help me to answer this question. Meanwhile, judging from literature that I had reviewed for other cases, I was willing to wager a dollar to a dime that non-party discovery was not authorized in a "civil-law" country like Chile.[15] For example, I knew that Great Britain (the country from which America derived her *common law* heritage) *barred* pretrial discovery of any sort from non-parties.[16]

Hence, I suspected that the farmer was attempting to conduct a "private investigation" that probably would be unauthorized (or illegal) in Chile.[17] Stated differently, I surmised that the farmer wanted me to help him to obtain an advantage that Chile did not want him to have, namely, information that he required (not only to "verify" his suspicions that he

15. See, e.g., Weinberg, *supra* note 13. Accord note, *Foreign Plaintiffs and Forum Non Conveniens: Going Beyond Reyno,* 64 Tex. L. Rev. 193, 199-201 and nn.39-52 (1985).

16. See, e.g., note, *id.* at 199 and n.43 ("English civil discovery law, for example, permits neither oral depositions of parties *nor any discovery from non-parties.*" (emphasis supplied)

17. I should mention, perhaps, that "official" (or government-sponsored) purely investigative requests from abroad stand on a different footing than "private" investigative requests. See, e.g., *In re Letter of Request from the Crown Prosecution Service of the United Kingdom,* 870 F.2d 686, 690-91 (D.C. Cir. 1989) (explaining that purely "investigative" requests for "discovery" from foreign "authorities," as opposed to "private" foreign litigants, would be honored by federal courts).

had been shortchanged but, more importantly), to "make" (or "file") a valid claim against his exporter under Chilean law.[18] In a (statutory) nutshell, I doubted that the farmer had a (bona fide) "matter pending" before a Chilean tribunal.[19]

Since the farmer was unable to persuade me otherwise, i.e., to satisfy his burden of proof (or persuasion), I denied his petition, albeit without prejudice. I invited him to present an amended petition, and suggested that he ask the arbitrator (or so on) to supply a writing explaining, in substance, that he (the farmer) had a "claim pending" (or "recognizable") under Chilean law, and that the American respondent subject to my jurisdiction probably had information that the *arbitrator* (as opposed to the farmer) was likely to need in order to administer justice Chilean-style.[20]

---

18. Although I didn't know as much about the adjudicatory model in Chile as I do now, see, e.g., R. Cappalli, *supra,* note 14, I was more or less familiar with the models used by most of the civil-law continental European countries. In West Germany, for example, the "pleadings" need to include the "proof," or the "source of proof," for each fact or contention that is required to establish the claim (or defense) asserted. A pleading will be stricken if it lacks "proof" of a necessary "fact" (or so on). See, e.g., Plett, *Civil Justice and Its Reform in West Germany and the United States,* 13 Just. Sys. J. 186, 190 (1988-89). ("German civil procedure presumes that the parties know the facts and how to prove them before a complaint is filed. The pleadings must disclose the allegations by which the parties plan to support the complaint or the defense, and the types of evidence they expect to use in proving their allegations.")

19. On the "matter pending" requirement, see the assistance statute, *supra* note 1.

20. I emphasized the arbitrator (as opposed to the farmer) because adjudication in civil law countries typically proceeds in an episodic (as opposed to a continuous) manner, and is conducted *entirely* by a judge who resembles an "investigator" searching for the "truth." My "guess" about the role

At first glance, this ruling probably seems jarring, especially for Pennsylvania readers. Yet, I think that American judges must resist the temptation to "export" (or "impose") American-style justice throughout the world.[21] In fairness to Chile, Pennsylvania has no interest worth mentioning in a foreign litigation that involves two Chileans and a claim that arises (if at all) because of transactions that occurred in Chile.[22]

True, an American "person" headquartered here in Philadelphia might (or might not) have some information that might (or might not) be useful in

of a Chilean arbitrator (or judge) turned out to be more or less on target. See, e.g., R. Cappalli, *supra* note 14, at 3-9. This style of justice is not adversarial by common law (or traditional American) standards because the lawyers (or parties) have no role worth mentioning in the gathering or presentation of evidence. For a brief description of the "investigative" style of justice that is used by most civil law countries, see, e.g., note 15, *supra*. For more detailed and intriguing discussions that also compare American civil court reform efforts with those now occurring in Italy, West Germany, and Great Britain, see *International Perspectives on Civil Court Reform*, 13 Just. Sys. J. 158-219 (1988-89).

21. Accord *Harrison v. Wyeth Laboratories Div. of Am. Home Prod. Corp.*, 510 F.Supp. 1, 4 (1980), *aff'd. without pub. op.*, 676 F.2d 685 (3d Cir. 1982) ("Questions [about] the safety of drugs [made and] marketed in a foreign country are properly the concern of that country; [American courts] are ill-equipped to set a standard of product safety for drugs sold [abroad].") See also, *id.* at 8 (contending, wisely I think, that U.S. courts should refrain from imposing American "cultural" standards upon other countries).

22. *Id.* See also, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) (refusing to allow Texas to adjudicate tort claims on behalf of non-Texan American widows and orphans ostensibly on the constitutional grounds that their fathers and husbands had been killed in Peru by the (negligent) conduct of an arguably "foreign" defendant). For a (devastating) critique of the decision in the *"Helicopter"* case, see, e.g., 4 Weinberg, *supra* note 13.

getting to the bottom of this Chilean dispute. This slender thread was Pennsylvania's only contact with an otherwise (hopelessly) foreign controversy. Although this modest contact would plainly support my assisting a Chilean *tribunal,* it was simply insufficient to justify my transforming a Chilean "accounting" into a Pennsylvania "civil action" and, hence, imposing a Pennsylvania *case processing* notion, like pretrial discovery, upon the Chilean litigants (or their claims).[23]

---

23. Pretrial discovery was one of the three so-called "major reforms" in civil case *processing* that was "invented" (or, more precisely, "reinvented") by a "blue-ribbon" committee appointed by the U.S. Supreme Court to assist in promulgating procedural "rules" for federal courts following Congress' passage of the Rules Enabling Act in 1934. Discovery (and the other case processing "reforms") was later enshrined in the federal Rules of Civil Procedure that were (eventually) promulgated in 1937. Afterwards, some academics, foolishly I think, ballyhooed the Federal Rules of Civil Procedure, and criticized the civil procedure used by state courts. See, e.g., Wright, *Modern Pleading and the Pennsylvania Rules,* 101 U.Pa.L. Rev. 909 (1953) (critiquing Pennsylvania civil procedure and contending that Pennsylvania rule-makers should adopt "modern" case processing notions). Cf., Amram, *A Reply to Professor Wright,* 101 U.Pa.L. Rev. 948 (1953) (explaining that Pennsylvania rule-makers would rather depend upon "tried and tested" procedures than make wholesale procedural changes).

Pennsylvania rule-makers began to surrender, albeit gradually, to the "charm" of broad discovery after 1951. In 1978, however, our procedural rules were more or less rewritten to authorize discovery on a *breathtaking* scale. Oddly, this "reform" occurred at the precise moment that federal rule-makers were "signaling" a major retrenchment involving discovery "rights." See, e.g., Friedenthal, *Herbert v. Lando: A Note on Discovery,* 31 Stan. L. Rev. 1035 (1979) (critiquing the U.S. Supreme Court for scapegoating discovery in an important case decision).

Considering the exalted authority of the federal "signals," it is hardly surprising that federal rule-makers curtailed discov-

Happily for the farmer, all of the initial concerns for procedural (or judicial system) comity that I voiced on Chile's behalf have since disappeared. I now have Letters Rogatory that were issued by the Chilean Supreme Court over the signature of five justices (or "ministers").[24] Consequently, the character of this assistance case has been "transformed," i.e., from a request involving a (private)

---

ery during the 1980s largely by promulgating "rules" that encouraged a notion that Professor Resnik has labeled "managerial judging." Resnik, *Managerial Judges,* 96 Harv. L. Rev. 374 (1982) (critiquing managerial judges and the proposed rule "validation" of their activities); see also, Sherman, *Restructuring the Trial Process in the Age of Complex Litigation* (Book Review), 63 Texas L. Rev. 721, 724-28 (1984) (critiquing managerial judges for curtailing discovery by usurping the traditional role assigned to lawyers and, hence, deciding for *themselves* (typically at an early stage of a litigation) what "issues" are likely to be important for settlement, dispositive motions, or trial). Professor Sherman wonders, as I do, how it is possible for a judge to learn more about a case in five minutes than all of the lawyers who may have been working on the case for months or years. *Id.* Because of the evolution of managerial judges, it is probably fair to say (albeit ironic) that litigants are "entitled" to more discovery nowadays in Pennsylvania courts than they are in federal courts. Accord Thompson, *How to Cross the Drawbridge to Discovery Court: A Few Palace Secrets,* 21 Phila. xxxv, xxxvii & n.6 (1991).

24. See Official Translation of Letters Rogatory, no. 1-177/90, issued by the Chilean Supreme Court on April 10, 1990. As a side-note, the first time I saw the (lengthy) letters was when counsel for the *respondent* included this document with the packet of exhibits that he filed in response to a briefing schedule that I laid down in January 1991. In other words, the Letters Rogatory were never sent to me by the arbitrator or given to me by the farmer. Moreover, I never received the letters from "official" (or diplomatic) channels. Since everyone connected with this case agrees that the letters were, in fact, issued, that the copy I have is "true," and so on, I decided this case as if the letters were, in fact, delivered to me in the diplomatic manner suggested by the Supreme Court of Chile. *Id.* at 19-20.

foreign litigant into a request from Chile's loftiest tribunal. Stated differently, concerns about Chile's domestic law (or procedure) have more or less disappeared from these proceedings. As Professor Cappalli put it, politely I think, "[I]t is reasonable to presume that the [request] was considered appropriate under Chilean law by the five signing ministers and the Public Minister."[25] He could have said, fairly I think, that Pennsylvania judges are hardly authorized to "second-guess" a tribunal in another country on the question whether or not its (domestic) law was correctly applied to a request for assistance.[26] Stated bluntly, if Unifrutti wants to object to Chile's formal request on those grounds, it must present its objection to the tribunal issuing the request, i.e., the Chilean Supreme Court.[27]

The letters ask me, in substance, to allow the farmer (or some other suitable person) to use court process in order to obtain certain designated documents from Unifrutti which the *arbitrator* is likely to need in order to conduct adjudication. It is easy to honor this (formal) request, largely because it resembles a routine discovery "demand" of the sort that I enforce on a regular basis for Pennsylvania litigants in pending actions. Hence, I will gladly join the Chilean Supreme Court in the pursuit of justice in a manner that (hopefully) approximates that

25. R. Cappalli, *supra* note 14, at 11.

26. See, e.g., *In re Mackenzie,* 1 Clark 356, 359 (1843). ("As to the doubt whether the [foreign tribunal] would compel the witnesses to testify, it was a doubt to be resolved by that tribunal itself, and one which [Pennsylvania judges] had no sort of right to decide for themselves.")

27. See, e.g., *Id.* at 360. ("[I]f it was true, as alleged, that these letters had been issued contrary to [foreign] law, undoubtedly [the foreign tribunal] would entertain a motion [to quash] on behalf of these witnesses, or of any other persons compromised by the issuing of the letters.")

which is customary before Chilean tribunals, subject to Pennsylvania notions of "fair play"[28] and, of course, procedural "due process."[29]

For these reasons, I direct the prothonotary to enter the following (interlocutory) order:[30]

---

28. On "fair play" in this context, see *infra* order and notes 31-32 (explaining, inter alia, that the respondent may invoke domestic testimonial privileges). I should add, perhaps, that the comity (or cooperation) between judicial systems typically *ends* at the point where one system is asked to enter an order that is offensive to its own notions of "fair play." For an early Pennsylvania discussion of comity, see, e.g., *Milne v. Morton,* 6 Binn. 353 (1814) (refusing to "recognize" a British tribunal's commission of a bankruptcy agent because British courts refused to recognize analogous commissions from American courts when their roles were reversed). For an intriguing 17th-Century Dutch discussion of comity that was noted with approval by the U.S. Supreme Court when it was (still) sitting in Philadelphia, see *Emory v. Grenough,* 3 U.S. (3 Dall.) 369, 370 n.1 (1797):

"By the courtesy of nations, [laws] within the limits of any government, are considered as having the same effect every where, *so far as they do not occasion a prejudice to the rights of the other governments, or their citizens.*" Quoting from a translation of 2 U. Huber, Praelectiones Juris Romani et hodiemi, bk.1, tit.3, p.26 (C. Thomas, L. Menke, and G. Gebaver eds. 1725). (emphasis added)

29. On procedural due process, see, e.g., Leubsdorf, *Constitutional Civil Procedure,* 63 Tex. L. Rev. 579 (1984). ("Because the whole system is meant to protect personal autonomy, the legal process should grant [litigants] considerable freedom to present the evidence and arguments they consider essential to protect their rights. In addition, the tribunal should respect the dignity of litigants and witnesses." *Id.* at 593.)

30. On the interlocutory nature of my order, see, e.g., *Pa. Human Relations Comm. v. Jones & Laughlin Steel Corp.,* 483 Pa. 35, 394 A.2d 525 (1978) (explaining that an order enforcing a subpoena and, hence, directing a person to report for a deposition is not appealable as of right until that person refuses to comply and is actually sanctioned). Accord *In re Letters Rogatory from the City of Haugesund, Norway,* 497 F.2d 378 (9th Cir. 1974).

## ORDER

And now, May 17, 1991, plaintiff's amended petition for issuance of a subpoena sur commission is granted. Subject to Pennsylvania Law of "privilege"[31] (and Pennsylvania practice and procedure for non-party depositions;)[32] the plaintiff may use court process, namely a subpoena duces tecum, to depose and, hence, to obtain from Unifrutti of America the records described (or mentioned) in the Letters Rogatory to which I have referred in the accompanying memorandum. Since I will preside (in accordance with the Chilean custom [or practice] of "in-court" inspection), counsel are directed to consult with my law clerk before selecting a date, time and place for the deposition.

---

31. It is almost always appropriate to apply Pennsylvania "privilege" law in proceedings of this sort since a resident typically arranges her affairs expecting that her in-state activities will be governed by "local" law. For a discussion, see, e.g., E. Scoles & P. Hay, *Conflict of Laws* §§12.10-12.14 (1986). ("[I]f the United States were the state of execution of a letter of request issued by another county, [the] witness would be allowed to claim [any privilege available under domestic law including the Fifth Amendment]." *Id.* at §12.13 & n.7.)

32. On my authority to "prescribe" the appropriate "practice and procedure," see the assistance statute, *supra* note 1. Apart from counsels' familiarity with Pennsylvania procedure (as opposed to Chilean procedure), I think that Rule 4012 (authorizing a deponent to seek relief from "unreasonable" discovery of *non-privileged* information) should be available to the respondent, e.g., to "shift" the expense associated with assembling and producing the designated documents.

As a side-note to Philadelphia lawyers, Pennsylvania procedure is almost always best for assistance cases except, perhaps, when the deposition sought is likely to be conducted entirely by out-of-state lawyers and the sister state procedure proposed is (hopelessly) compatible with Pennsylvania procedures (and practices) for non-party depositions.